IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A VERIZON ZTE FLIP PHONE WITH MEID NUMBER 256691623102569811 ("DEVICE 1") AND A VERIZON I-PHONE 6 WITH MEID 35541107457253 ("DEVICE 2") CURRENTLY LOCATED AT 5751 UPTAIN ROAD, SUITE 417, CHATTANOOGA, TENNESSEE | Case No. 1:18-mj-110<br>1:18-mj-111 |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE

I, Rodd Watters, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property – electronic devices, to wit, two cellular telephones currently in law enforcement possession – and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) Field Office in Chattanooga, Tennessee. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3. I am a Special Agent ("SA") with the Tennessee Bureau of Investigation ("TBI") and "an investigative or law enforcement officer" of the State of Tennessee; that is, an officer of the State of Tennessee who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Tenn. Code Ann. §40-6-305. I graduated from the Tennessee Law Enforcement Training Academy in 1992 and throughout my law enforcement service, have maintained, as a primary career path, the investigation and seizure of illegal narcotics. I have served as patrol officer, violent crimes investigator, and have been a Special Agent with the Tennessee Bureau of Investigation since September 15, 1998. My most recent position prior to employment with the Tennessee Bureau of Investigation was as police officer with the Clarksville Police Department. I held this position for approximately six (6) years.

4. During my experience and tenure as a narcotics investigator and task force officer, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws. As part of my official duties, I have utilized most traditional law enforcement techniques, including visual surveillance, interviewing of witnesses, the execution of search warrants, the use of cooperating witnesses, the seizure of drug evidence, the controlled purchases of drug evidence, court authorized pen registers, court authorized interceptions of wire communications, the federal grand jury, and undercover techniques. I have debriefed numerous cooperating defendants and confidential informants regarding the habits, practices, methods and general behavior of criminal groups engaged in organized criminal activity.

5. I have personally participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers. I have received specialized training in conducting drug investigations and have attended numerous

conferences and lectures featuring government attorneys and law enforcement officials. Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including the use of cellular telephones and of digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

6. In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, and financial records. These investigations have resulted in the arrest of individuals who have smuggled, received, and/or distributed controlled substances, including but not limited to methamphetamine, heroin, cocaine hydrochloride, cocaine base, and marijuana, as well as the seizure of controlled substances and the proceeds of the sale of these controlled substances. I know based upon my training and experience, that narcotics traffickers and money laundering organizations routinely utilize several operation techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities that consist of the transportation and distribution of controlled substances and subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

7. As a result of my experience and training, I am aware that is common for drug traffickers to utilize cellular telephones and other portable electronic devices to communicate about their drug trafficking activities. In a number of investigations that I been involved in, these

devices have also been found to function as a computer whereas a subject can access the internet, e-mail servers, social media sites, and other mobile applications which are frequently used to communicate with their sources of supply, customers, and other co-conspirators. These devices also typically contain other data relevant to criminal activity to include GPS and mapping data, photographs, and contact lists.

8. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9. The property to be searched is a Verizon ZTE Flip phone (Device 1) and a Verizon I-phone 6 (Device 2). Device 1 has number (216) 630-4424 with MEID 2566916231025698 1 1. Device 2 has number (423) 883-9624 with MEID 35541107457253. Devices 1 and 2 are currently in TBI/DEA's possession and are being temporarily stored at the TBI Office.

10. The applied-for warrant would authorize the forensic examination of the Devices 1 and 2 for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11. Your affiant is aware of an ongoing criminal investigation of Cameron Hunter-Loftin Aka Cameron HUNTER-LOFTON, AKA Cameron HUNTER, AKA Cameron LOFTIN being conducted by DEA, TBI, Chattanooga Police Department (CPD), and the Hamilton County (Tennessee) Sheriff's Department (HCSO). This investigation has identified HUNTER-

LOFTIN as a heroin distributor and a validated member of the street gang Bounty Hunter Bloods responsible for driving acts of violence in Chattanooga, Tennessee.

12. On February 1, 2018, Judge Don Poole, Criminal Court Judge in the 11th Judicial District of Tennessee, issued an order authorizing interception of communications on (423)314-4830, a cellular phone utilized by Monte BREWER. Interception of (423)314-4830 began on February 2, 2018. During the interception, your affiant intercepted calls that in your affiant's training, experience, and knowledge of the investigation related to BREWER's involvement in distributing illegal narcotics (heroin) and criminal street gang activities (violence).

13. Between February 2, 2018, the date interception began, and February 12, 2018, agents intercepted Target Telephone (423)314-4830 and Device 2. Based on the intercepted phone conversations (calls or text messages) between Monte BREWER and Device 2, and surveillance conducted by law enforcement, the person communicating with BREWER via Device 2 was identified by law enforcement as a source of supply (SOS) of heroin for BREWER.

14. Investigating agents determined that Device 2 was being utilized by Cameron HUNTER-LOFTIN. During those 10 days of interception, agents identified approximately 18 pertinent contacts between Target Telephone (423)314-4830 and Device 2. The intercepts also confirmed that Cameron HUNTER-LOFTIN is a close associate of BREWER and is driving a significant portion of the gang related violence in Chattanooga, Tennessee.

15. On February 5, 2018, the Chattanooga Police Department responded to 6430 Bonnie Manor Drive in Chattanooga, Tennessee. The complainant, Rachel LOFTIN, reported

that at approximately 2:30AM someone shot multiple rounds into her residence. Officers on the scene verified Mrs. LOFTIN's story by locating several spent shell casings in the roadway in front of the residence. Additionally, officers located where a single round entered the residence through a front window and lodged into the headboard of a Mrs. LOFTIN'S juvenile son's bed. Mrs. LOFTIN explained to the officers that her elder son Cameron LOFTIN-HUNTER was a member of a local street gang and suspected that this may have been a result of his gang involvement.

16. At approximately 12:38PM, a call was intercepted on the court-authorized intercept between BREWER and HUNTER-LOFITN, who was using Device 2. In this call, HUNTER-LOFTIN told BREWER that his mother's residence was shot up last night in a drive by shooting. HUNTER- LOFTIN told BREWER, "They did a drive-by and shot through the front....through Anthony's window." Your affiant is aware that HUNTER-LOFTIN'S younger brother is Anthony LOFTIN.

17. At approximately 2:59PM, BREWER called HUNTER-LOFTIN, who was on Device 2. In this call, BREWER and HUNTER-LOFTIN discussed another shooting in which members of the street gang Tree Top Piru conducted a drive-by shooting of another Gangster Disciple. BREWER and HUNTER –LOFTIN agreed to meet, and BREWER said, "Oh yeah. We finna smack everything, bitches and all." Based on your affiant's training, experience, and knowledge of the investigation when BREWER said, "Oh yeah. We finna smack everything, bitches and all," he was saying that they are about to shoot everything associated with Tree Top Piru including their girlfriends and wives. HUNTER-LOFTIN, on Device 2, replied, "Damn right."

18. As a result of the intercepted calls, law enforcement established surveillance on BREWER. Surveillance units observed HUNTER-LOFTIN driving a white Ford Explorer arrive at BREWER's mother residence and pickup BREWER. The vehicle was also occupied by two other individuals at the time. Surveillance units maintained surveillance of the vehicle as it left the residence and traveled to the Alton Park area of Chattanooga, Tennessee. Once in the Alton Park area surveillance units noted the vehicle was traveling several back streets in this area. Surveillance units lost sight of the vehicle as it traveled at a high rate of speed in a subdivision west of Rossville Blvd in Chattanooga, Tennessee.

19. Intercepted calls indicated that shortly after losing sight of the Ford Explorer HUNTER-LOFTIN, BREWER, and the other occupants of the vehicle shot at members of the Tree Top Piru gang at a residence in an area just off Rossville Blvd. Surveillance units then located the Ford Explorer on Brainerd Road near the intersection of Belvoir Road in Chattanooga, Tennessee. Your affiant coordinated with the Chattanooga Police Department in an effort to make a traffic stop of the vehicle. However, the vehicle turned off Brainerd Road and began traveling side streets and surveillance units once again lost sight of the vehicle. Members of the Chattanooga Police Department Street Crimes Unit traveled to the area of Kemp Drive, a street where members of the Tree Top Piru and Kemp Drive Posse frequent. Upon arriving in the area of Kemp Drive, Officer Schriven of the Street Crimes Unit located the Ford Explorer. Officer Schriven attempted to stop the Ford Explorer, but the vehicle fled. Chattanooga Police Department currently has a departmental policy that prevents officers from pursuing offenders without authorization. As a result, the Ford Explorer eluded the officers.

20. On March 2, 2018, DEA TFO Jamie Hixson applied for and obtained a state court

authorized Title-III authorization for Device 2. Many of the intercepted conversations between HUNTER-LOFTIN and his associates during the authorized period of interception were determined to be related to narcotics distribution and/or gang violence. For example, on March 8, 2018, HUNTER-LOFTIN and co-conspirator Monte BREWER had the following conversation over Device 2[1]:

> MB- Cuz, I need a pound, cuz.
> CH- What?
> MB- I need a pound. What you going to charge me for a pound?
> CH- Man, uhhh.....shit I aint got that much....you hear me?
> MB- Say you aint got no pound? I thought you went and got some bags yesterday, G.
> CH- I went and got a bag.
> MB- Damn.
> CH- Yeah, yeah, yeah.
> MB- Hey give me uhhh..... What you going to sell me a half pound for?
> CH- I dont know. Im going to pull up on you. Where you at?
> MB- Ummm...fixing to come up on Ooltewah already.
> CH- Alright. Meet me somewhere. It dont matter.
> MB- Well shit. Go to the gas station by momma house.
> CH- Man you going to have to come closer to Brainerd bruh.
> MB- Man, there you go bruh.
> CH- Just meet me by the mall man. Meet me somewhere right there. Meet me on Shallowford at the Speedway.
> MB- Oh or you can go meet me at the Chop House by the mall.
> CH- Man meet me at the Shallowford Road Speedway.
> (call ends)

---

[1] Transcriptions in this Affidavit from wire intercepts are based on "line sheets" containing the call monitor's contemporaneous recording of a spoken call. They may contain spelling and punctuation variants or phonetic transcriptions.

Based on your affiant's training, experience, and knowledge of the investigation, affiant believes that in this call BREWER attempts to buy a pound of marijuana from HUNTER-LOFTIN. HUNTER-LOFTIN tells BREWER he does not currently have a pound of marijuana and agrees to sell BREWER a half a pound of marijuana at a price to be determined.

21. On June 28, 2018, your affiant was notified by ATF Special Agent Chris Moon that he and agents from his agency had located HUNTER-LOFTIN at his mother's apartment at Integra Hills Apartments in Collegedale. SA Moon advised your affiant that they took HUNTER-LOFTIN into custody on an outstanding federal arrest warrant for being a felon in possession of a firearm. Upon taking him into custody, they located Devices 1 and 2 on the person of HUNTER-LOFTIN. Your affiant arrived at location of the arrest and informed HUNTER-LOFTIN of the seizure of both Device 1 and 2, and asked for consent to search both devices. Consent was denied by HUNTER-LOFTIN. TBI/DEA took custody of Devices 1 and 2 and they are currently being maintained by the TBI.

22. Based on the above-described facts, your Affiant believes that Cameron HUNTER-LOFTIN is a significant distributor of heroin in the Eastern District of Tennessee. HUNTER-LOFTIN is also a member of the Bounty Hunter Bloods street gang and is associated with members of the Gangster Disciple street gang. During this investigation, HUNTER-LOFTIN has been intercepted utilizing Device 2 to discuss multiple illegal narcotics transactions as well as gang violence. Device 1 was found in the possession of HUNTER-LOFTIN during his arrest on an outstanding Federal warrant. Based on your affiant's training and experience as well as the knowledge of this case, most subjects involved in the distribution of illegal narcotics, to include HUNTER-LOFTIN, utilize multiple telephones. It is also known by your affiant that

these same subjects discard and/or change cellular devices or phone numbers on a regular basis. Your affiant believes this is a technique utilized by the members of this and other drug distribution organizations to hinder law enforcement investigations.

23. On June 28, 2018, agents of the TBI and DEA Chattanooga Resident Office took temporary custody of Devices 1 and 2. Devices 1 and 2 are currently in the lawful possession of the TBI. As described above, Devices 1 and 2 came into TBI/DEA's possession subsequent to the execution of an arrest warrant on LOFTIN-HUNTER.

24. Devices 1 and 2 are currently being stored at the Tennessee Bureau of Investigation. Based on my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices came into the possession of the TBI/DEA.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I believe that Devices 1 and 2 have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and/or PDAs. Devices 1 and 2 also have Internet capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Device 1 was used, the purpose of their use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on these devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the devices consistent with the warrants. The examination may require authorities to employ techniques,

including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

30. *Manner of execution.* Because these warrants seek only permission to examine devices already in law enforcement's possession, the execution of these warrants does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

31. I submit that this affidavit supports probable cause for search warrants authorizing the examination of Devices 1 and 2 (as described in Attachments A-1 and A-2, respectively) to seek the fruits, evidence, and instrumentalities of crimes against the United States, as more particularly described in Attachment B.

32. WHEREFORE, based on the facts detailed in this affidavit, together with your affiant's knowledge, training, and experience in gangs and violent crime investigations, your affiant believes and submits there is probable cause to believe that evidence of the illegal distribution of heroin and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; evidence of prohibited persons being in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1); evidence of the use of firearms to commit a violent act in violation of Title 18, United States Code, Section 924(c); and evidence of

a conspiracy to use a firearm to commit a violent act in violation of Title 18, United States Code, Section 924(o) will be found in the examination of Devices 1 and 2.

Respectfully submitted,

Rodd Watters
DEA Task Force Officer

Subscribed and sworn to before me
on November 8, 2018.

CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is a Verizon ZTE Flip phone (Device 1), assigned phone number (216) 630-4424 with MEID 256691623102569811. Device 1 is currently in TBI/DEA's possession and is being temporarily stored at the TBI Office.

# ATTACHMENT B

## Particular Things to be Seized

All records and data on Device 1 and Device 2, as described in Attachments A-1 and A-2, that relate to violations of Title 21 USC §§ 841(a)(1) and 846; as well as evidence of violations of Federal firearms laws, particularly in violation of Title 18 §§ 922(g) and 924(c), as described in the affidavit, and the identities of those involved in such violations, including:

a. Evidence of user attribution showing who used or owned Device 1 and 2 during the planning or commission of any such violations

b. Any data or information related to the identity of the person(s) who communicated with the user of Device 1 and 2 about matters relating to the commission of the above-referenced crimes;

c. Any data or information, including GPS data, GPS data establishing the user's connection to the commission of the above-referenced crimes;

d. Photographs evidencing the planning of, or individuals involved in, the commission of the above-referenced crimes;

e. Web searches related to the commission of the above-referenced crimes; and

f. the assigned number of the cellular phone, text messages, deleted text messages, recently dialed or received numbers, voice mail messages, telephone numbers, GPS information, e-mail messages (to include deleted emails), address book information (including deleted addresses/phone numbers), videos and photographs related to the above-referenced crimes.

    a. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.